UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

v.                                                      Case No. 8:24-cr-401-KKM-AEP

MARIA MORALES,

   Defendant.

_____

ORDER

The United States moves in limine to exclude the testimony of two witnesses

because it is irrelevant. Mot. in Limine (MIL) (Doc. 84). Defendant Maria Morales

opposes. Resp. (Doc. 87). The motion is granted in part and denied in part. Morales

may elicit testimony from Dr. Amy Gambow and Sandra Morales that tends to show

that Maria Morales is gullible and susceptible to manipulation. But she may not elicit

testimony about her adjustment disorder with depressive mood or testimony that

merely paints her as a nice person.

## I.   BACKGROUND

A grand jury indicted Maria Morales for one count of trafficking in and using

unauthorized access devices, 18 U.S.C. § 1029(a)(2), and four counts of aggravated

identity theft, 18 U.S.C. § 1028A. Indictment (Doc. 1) ¶¶ 6–9. To convict Morales on the first count, the government must prove beyond a reasonable doubt that Morales (1) "knowingly trafficked in one or more unauthorized access devices;" (2) "during a 12-month period, obtained a thing or things of value totaling $1,000 or more as a result of such trafficking in unauthorized access devices;" (3) "acted with the intent to defraud or deceive; and" (4) that her "conduct affected interstate or foreign commerce." 11th Cir. Pattern Jury Instructions Crim. O41.2 (Apr. 2024) (cleaned up); *see also* 18 U.S.C. § 1029(a)(2).

The government intends to prove that Morales stole $1.9 million in state "unemployment insurance benefits." Trial Tr. (Day 1) (Doc. 74) 21:8–13 (government's opening statement).[1] It contends that she did so by withdrawing thousands of dollars from ATMs using debit cards issued in other people's names. *Id.* 23:12–24:3. She got the cards, the government maintains, because an accomplice filed unemployment benefits applications under other people's names and had the cards sent to Morales's home; Morales and the accomplice later split the proceeds. *Id.* 24:7–15.

---

[1] A previous trial ended in a hung jury and a mistrial. *See* Trial Tr. (Day 3) (Doc. 75) 24:9–10.

Morales seeks to negate the third element of access-device fraud—intent to defraud or deceive—by arguing that her "accomplice" manipulated her. She argues that Nerio Otoniel, a Ghanian with whom Morales had an "online relationship," tricked her into believing that the "money was coming from [Otoniel's] business." *Id.* 26:10–20. On her telling, Morales was "taking out money to send to who she thought was a man who loved her" and who had a right to the funds. *Id.* 26:19–23.

In support of this theory, Morales intends to call two witnesses to testify that she is gullible and susceptible to manipulation—Dr. Amy Gambow, a psychologist, and Sandra Morales, the defendant's sister. *See* Resp. at 1; Trial Tr. (Day 1) 27:1–8. The government seeks to exclude this evidence. MIL.

I held a pretrial conference on June 3, 2025, at which I ordered Morales to explain the factual predicate for her gullibility defense. (Doc. 98). She has responded. Supp. (Doc. 100).

## II.   LEGAL STANDARD

Evidence is relevant only if it tends to make a fact of consequence "more or less probable than it would be without the evidence." FED. R. EVID. 401. Relevant evidence is admissible subject to the federal evidentiary rules and other provisions of federal law, while irrelevant evidence is inadmissible. *Id.* 402. "A defendant . . . has

the right to introduce evidence that is not directly relevant to an element of the offense, but that makes the existence or non-existence of some collateral matter somewhat more or less likely, where that collateral matter bears a sufficiently close relationship to an element of the offense." *United States v. Hurn*, 368 F.3d 1359, 1364 (11th Cir. 2004). A party may offer an expert witness if that expert's "knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702(a). And in a criminal case, "a defendant may offer evidence of the defendant's pertinent trait." *Id.* 404(a)(2)(A).[2]

---

[2] The parties assume that "gullibility" and "susceptibility to manipulation" are character traits subject to Rule 404. Yet "character" ordinarily carries moral overtones—a sense of good or bad, right or wrong—that seem absent from gullibility. *See* FED. R. EVID. 405 advisory committee note to 1972 proposed rules ("Traditionally character has been regarded primarily in moral overtones of good and bad: chaste, peaceable, truthful, honest."); *see also United States v. Burke*, 900 F.2d 260, 1990 WL 51395, at *5 (6th Cir. 1990) (per curiam) (table); 1 MCCORMICK ON EVIDENCE § 186 (9th ed. Feb. 2025 update); 22B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 5233 (2d ed. May 2025 update). The tendency of someone with subpar cognitive abilities to miss deception seems in many ways more like an amputee's "tendency to limp" or a sick person's "tendency to sniffle," neither of which is a character trait. 1 MCCORMICK ON EVIDENCE § 186. That said, in its 1972 note to Rule 405, the Advisory Committee observed that "[n]o effective dividing line exists between character and mental capacity," suggesting that amoral mental properties might be character traits for some evidentiary purposes. As the parties do not contend that the outcome here depends on whether gullibility or susceptibility to manipulation are character traits, I need not decide whether Rule 404 governs.

## III.   ANALYSIS

The government contends that all the testimony Morales seeks to admit through Dr. Gambow and Sandra Morales is irrelevant and inadmissible. That argument is right as to some of the anticipated testimony—but not most of it.

### A. Factual Predicate

To begin with, at the pretrial conference I directed Morales to identify the factual predicate for her argument that Otoniel tricked her into withdrawing the money using debit cards in other people's names. Without some factual basis for her deception argument, evidence of her gullibility would be irrelevant and inadmissible. *See* FED. R. EVID. 401(a), 402. As a factual basis, Morales identified statements that she made to government investigators in a recorded interview, Supp. at 1, and she submitted an interview transcript, *see* Interview Tr. (Doc. 100-1).

During that interview, Morales discussed with the investigators her relationship with Otoniel. She suggested that the relationship was "catfish[ing]"[3] and that Otoniel "claim[ed] to be in love with [her]." Interview Tr. at 13. She explained

---

[3] "Catfishing" is "[t]he practice of creating a fictional online persona in order to lure someone into a false sense of having a relationship, [usually] for the purpose of engaging in a scam." *Catfishing*, BLACK'S LAW DICTIONARY 271 (12th ed. 2024).

5

that Otoniel lives in Ghana, she has never met him face-to-face, she cannot call him directly, and she has been in a "relationship" with him for "about eight years." *Id.* at 14. As Morales tells it in the interview, Otoniel told her to "take money out" "of the [debit] cards" and "send them through Bitcoin or whatever to him." *Id.* at 18. Crucially, she claims that Otoniel "made it sound like [the people whose names were on the debit cards] were his clients" and told her that "they were getting goods for him, but they were paying him in that way." *Id.* at 27.

These statements create an adequate factual predicate for Morales to introduce evidence of her gullibility, subject to the discussion below. Read in the light most favorable to Morales, her statements to the investigator could be understood to mean that she believed Otoniel had a legitimate business relationship with the people whose names were on the debit cards and that Morales thought she was assisting in a legitimate transaction. Because Morales's belief that the debit-card withdrawals were legitimate transactions for Otoniel's business goes to her intent to commit fraud, Morales has established a factual predicate for introducing evidence that makes it more likely that she held that belief. *See* FED. R. EVID. 401.

## B. Dr. Amy Gambow's Testimony

The government seeks to exclude evidence related to two diagnoses that Dr. Gambow made as to Morales. MIL at 5–6. First, Dr. Gambow diagnosed Morales with "adjustment disorder with depressed mood," which manifests as "daily sadness, concentration troubles, [and] poor sleep." Gambow Tr. (Doc. 84-1) 5:19–23. Second, Dr. Gambow determined Morales has "a disorder of borderline intellectual functioning, which means she is functioning somewhat lower compared to people her same age in terms of cognitive and social and daily living skills." *Id.* 6:6–9. According to the government, testimony related to either diagnosis will not help the jury understand the evidence or determine any fact at issue, *see* FED. R. EVID. 702(a), because (1) Morales's "self-reported daily sadness, poor sleep, and concentration troubles in 2025 are irrelevant to a determination on whether she intended to commit millions of dollars in fraud during 2020 and 2021" and (2) "[h]aving a low IQ is not probative of [Morales's] criminal intent." MIL at 5.

I agree with the government as to Morales's adjustment order but not as to her borderline intellectual functioning. Taking the second diagnosis first, Dr. Gambow's testimony may help a jury decide whether to believe Morales's claim that she thought she was helping Otoniel facilitate legitimate business payments rather

than committing fraud. Dr. Gambow explained that, based on her examination of Morales, she concluded that

> [Morales] is very naive. She is very trusting, and she has difficulty understanding when she might be taken advantage of or when people are asking her to do things. She doesn't quite see those red flags in those relationships, so it makes her a huge target.

Gambow Tr. 15:7–11. If the jury credits it, this testimony makes Morales's claim that Otoniel deceived her—and she thus did not intend to commit fraud—more plausible. *Cf. United States v. Moody*, 903 F.2d 321, 327 (5th Cir. 1990) (observing that evidence of an organization's "sordid nature" was relevant to defendant's attempt to "negat[e] specific intent" by showing "that he unwittingly became a participant in a sophisticated scam").

The government responds that Morales's borderline intellectual functioning is not probative of her understanding of "the difference between right and wrong" or "her ability to be honest or truthful or to understand what it means to be truthful and honest." MIL at 5–6. Yet Morales does not seek to offer this testimony as evidence of her honesty or truthfulness, *see United States v. Hough*, 803 F.3d 1181, 1190–91 (11th Cir. 2015), nor her sanity, *see M'Naughten's Case*, (1843) 8 Eng. Rep. 718 (HL); 1 WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 7.2 (3d. ed. Oct.

2024 update). Instead, she intends to use the evidence to bolster her claim that Otoniel tricked her into believing she was participating in a legitimate transaction, which goes to intent. The evidence is relevant and admissible for that purpose. Accordingly, Dr. Gambow may testify about Morales's borderline intellectual functioning.

On the other hand, any evidence of Morales's adjustment disorder is irrelevant. As the government rightly points out, Morales's "self-reported daily sadness, poor sleep, and concentration troubles in 2025" do not make her theory of intent any more likely. MIL at 5. Dr. Gambow explained that Morales herself attributed her symptoms to "this case." Gambow Tr. 5:22–23; *id.* 20:24–21:19. As any testimony about Morales's adjustment disorder is irrelevant, that testimony is excluded. *See* FED. R. EVID. 402.

### C. Sandra Morales's Testimony

The government also seeks to exclude the testimony of Sandra Morales, Maria Morales's sister. MIL at 6–7. Sandra testified at the last trial that Maria Morales is "too nice," is "the most gullible person [that Sandra] know[s] personally, and "thinks everybody in the world is nice and sweet like [Maria Morales] is, which leads her to be influenced by people." Sandra Morales Tr. (Doc. 84-2) 3:4, 8–9, 13–15. The

government argues that this testimony is irrelevant "because being nice or gullible has nothing to do with a person's ability to commit the charged crimes." MIL at 7.

As explained above, Morales's explanation for why she lacked the intent to commit fraud—an element of the offense—is more likely if she is gullible. *See* 18 U.S.C. § 1029(a)(2); FED. R. EVID. 401. Accordingly, Morales may offer her sister's testimony on that subject at trial. *See also* FED. R. EVID. 701(c) (permitting lay opinion testimony when that testimony is "not based on scientific, technical, or other specialized knowledge"). That said, Morales's counsel should be careful to elicit testimony directed toward Morales's susceptibility to manipulation, not testimony about Morales's general goodness or niceness. *See* MIL at 7; *see also, e.g.*, Sandra Morales Tr. 3:4 ("My sister is overly nice. Yes, she is too nice."). The government may renew its objection should Sandra Morales's testimony stray into irrelevance or otherwise impermissible character evidence.

## IV.   CONCLUSION

The United States's Motion in Limine (Doc. 84) is **GRANTED-IN-PART** and **DENIED-IN-PART**. Dr. Gambow may testify about Morales's borderline cognitive functioning but not her adjustment disorder. Sandra Morales may testify about Maria Morales's gullibility, but the government may renew its objection should Sandra's testimony veer into Maria Morales's general "niceness" or a similar subject.

**ORDERED** in Tampa, Florida, on June 10, 2025.

Kathryn Kimball Mizelle
United States District Judge